**ORAL ARGUMENT REQUESTED**

**No. 13-1058**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**LILLIPUTIAN SYSTEMS, INC.**

*Petitioner,*

v.

**PIPELINE AND HAZARDOUS MATERIALS
SAFETY ADMINISTRATION**

*Respondent,*

---

On Petition for Review of the Final Order of the Pipeline and
Hazardous Materials Safety Administration

---

**OPENING BRIEF OF PETITIONER**

Gregory S. Walden
Stephen A. Vaden
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-6000 – Telephone
(202) 457-6315 – Facsimile

*Counsel for Petitioner Lilliputian Systems, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to D.C. Circuit Rule 28(a)(1):

(A)    **Parties and Amici.**  The Petitioner in this Court is Lilliputian Systems, Inc. ("Lilliputian").

The Respondent in this Court is the Pipeline and Hazardous Materials Safety Administration of the Department of Transportation ("PHMSA").

There are no amici at this time.

(B)    **Rulings Under Review**.  The ruling under review is the Respondent's Final Rule entitled "Hazardous Materials:    Harmonization with the United Nations Recommendations, International Maritime Dangerous Goods Code, and the International Civil Aviation Organization Technical Instructions for the Safe Transport of Dangerous Goods by Air," Docket No. PHMSA-2009-0126 (HM-215K), published in the Federal Register on January 19, 2011, 76 Fed. Reg. 3308, and the PHMSA's denial of Petitioner's timely administrative appeal, which the agency denied on January 7, 2013.  78 Fed. Reg. 1101, 1104.

Petitioner specifically seeks review of that portion of the Final Rule that revises 49 C.F.R. § 175.10(a)(19) to prohibit passengers from placing spare butane fuel cell cartridges in checked baggage.  76 Fed. Reg. at 3382.

(C)    **Related Cases**.  Petitioner is not aware of any related cases before this or any other Court.

## RULE 26.1 STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Petitioner Lilliputian Systems, Inc. ("Petitioner") makes the following disclosures:

1.      Petitioner is incorporated in the State of Delaware;

2.      Petitioner has developed a butane-powered micro fuel cell and fuel cell cartridge for use in consumer electronic devices as well as in commercial and industrial applications;

3.      Petitioner has no parent company;

4.      Intel Corporation is a publicly held corporation and has a greater than 10% ownership interest in Petitioner;

5.      Rusnano Corporation is a publicly held Russian corporation and has a greater than 10% ownership interest in Petitioner; and

6.      No other publicly held corporation has a 10% or greater ownership interest in Petitioner.

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................... i

RULE 26.1 STATEMENT ....................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. v

GLOSSARY ......................................................................................................... viii

STATEMENT OF JURISDICTION ...................................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................................ 1

STATUTES AND REGULATIONS ...................................................................... 2

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................................... 3

SUMMARY OF ARGUMENT ................................................................................ 8

STANDING ........................................................................................................... 8

ARGUMENT ......................................................................................................... 9

I.   PHMSA FAILED TO PROVIDE A REASONED EXPLANATION FOR
     REFUSING TO FOLLOW THE PRESUMPTION THAT ITS
     REGULATIONS SHOULD BE HARMONIZED WITH INTERNATIONAL
     STANDARDS. ............................................................................................... 10

     A.  Standard of Review ................................................................................ 11

     B.  PHMSA Improperly Withheld Its Methodology for Assessing Risk,
         Necessitating the Vacatur of the Challenged Portion of the Rule. ................ 11

     C.  PHMSA Failed to Provide a Reasoned Explanation for Its Actions,
         Necessitating the Rule's Vacatur. ....................................................... 17

II. IN ADDITION TO FAILING TO PROVIDE AN EXPLANATION, PHMSA
   REFUSED TO RESPOND TO NUMEROUS SUBSTANTIVE COMMENTS,
   REQUIRING VACATUR OF THE RULE. .............................................................. 27

CONCLUSION ................................................................................................................ 36

CERTIFICATE OF COMPLIANCE ................................................................................. 38

CERTIFICATE OF SERVICE ............................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

C̲A̲S̲E̲S̲

*Action on Smoking Health v. Civil Aeronautics Bd.*,
  699 F.2d 1209 (D.C. Cir. 1983).................................................28, 29

*Advocates for Hwy. & Auto Safety v. Fed. Hwy. Admin.*,
  28 F.3d 1288 (D.C. Cir. 1994)....................................................16

*Alltel Corp. v. FCC*,
  838 F.2d 551 (D.C. Cir. 1988)..........................................20, 28, 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...................................................................11

*Delta Air Lines, Inc. v. Export-Import Bank of the United States*,
  718 F.3d 974 (D.C. Cir. 2013) ....................................................26

*Home Box Office, Inc. v. FCC*,
  567 F.2d 9 (D.C. Cir. 1977) (per curiam)...........................27, 28, 35

*Kristin Brooks Hope Ctr. v. FCC*,
  626 F.3d 586 (D.C. Cir. 2010)...............................................25, 26

*La. Fed. Land Bank Ass'n v. Farm Credit Admin.*,
  336 F.3d 1075 (D.C. Cir. 2003)...................................................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...........................................................10, 18, 24

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
  494 F.3d 188 (D.C. Cir. 2007)................................10, 13, 16, 26

*Solite Corp. v. EPA*,
  952 F.2d 473 (D.C. Cir. 1991) ....................................................13

*Authorities upon which we chiefly rely are marked with asterisks.

**Page(s)**

## CASES (CONT.)

*United Mine Workers of Am. v. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ........................................................17, 26

*United States Lines, Inc. v. Fed. Maritime Comm'n,*
    584 F.2d 519 (D.C. Cir. 1978) ...............................................................11

## STATUTES

5 U.S.C. § 553(c) ............................................................................12

5 U.S.C. § 706(2)(A) .......................................................................11

49 U.S.C. § 5103 .....................................................................1, 2, 11

49 U.S.C. § 5104 .........................................................................1, 2

49 U.S.C. § 5110 .........................................................................1, 2

49 U.S.C. § 5112 .........................................................................1, 2

*49 U.S.C. § 5120 .............................................................1, 2, 10, 19

49 U.S.C. § 5127 .......................................................................1, 8, 11

## OTHER AUTHORITIES

49 C.F.R. § 175.10 ..............................................................25, 31, 32

74 Fed. Reg. 53982 (Oct. 21, 2009) ...........................................................5

*75 Fed. Reg. 52070 (Aug. 24, 2010) .....................5, 10, 12, 14, 19, 20, 21, 22, 24, 26, 30, 31

*76 Fed. Reg. 3308 (Jan. 19, 2011) ...........1, 4, 6, 12, 14, 15, 16, 19, 21, 22, 23, 24, 26, 30, 31

77 Fed. Reg. 31274 (May 25, 2012) ...........................................................7

*78 Fed. Reg. 1101 (Jan. 7, 2013) ...........1, 7, 9, 14, 15, 19, 21, 22, 24, 26, 30, 33, 34

http://www.icao.int/about-icao/Pages/default.aspx .........................................5

**Page(s)**

**OTHER AUTHORITIES (CONT.)**

http://www.iec.ch/about/profile/?ref=menu......................................................................... 4

FAA Technical Center Report:  Preliminary Investigation of the
Fire Hazard Inherent in Micro Fuel Cell Cartridges ....................................... 6, 15, 16, 23, 34

# <u>GLOSSARY</u>

| | |
|---|---|
| APA | Administrative Procedure Act |
| DGAC | Dangerous Goods Advisory Council |
| DGP | Dangerous Goods Panel |
| HMR | Hazardous Materials Regulations |
| IATA | International Air Transport Association |
| ICAO | International Civil Aviation Organization |
| IEC | International Electrotechnical Commission |

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this Petition for Review under 49 U.S.C. § 5127, which provides that "a person adversely affected or aggrieved by a final action of the Secretary . . . may petition for review of the final action in the United States Court of Appeals for the District of Columbia . . . . The petition must be filed not more than 60 days after the Secretary's action becomes final." The Secretary promulgated the Final Rule on January 19, 2011. *See* 76 Fed. Reg. 3308. Lilliputian timely filed its administrative appeal on February 18, 2011. *See* J.A. at 90. PHMSA rejected Lilliputian's appeal on January 7, 2013, ending all proceedings before the agency. *See* 78 Fed. Reg. 1101, 1104. Lilliputian filed its Petition for Review in this Court on March 8, 2013. *See* Dkt. No. 1.

The Secretary has authority to issue regulations governing the harmonization of American hazardous material regulations with their international counterparts under 49 U.S.C. § 5120(b). *See also* 49 U.S.C. §§ 5103(b), 5104, 5110, 5112.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether PHMSA's decision to deviate from the international consensus and prohibit passengers from placing spare butane fuel cell cartridges in checked airline baggage, while allowing other, similar items to be placed in checked airline baggage, was arbitrary and capricious, an abuse of discretion, without adequate or sufficient support in the administrative record, or otherwise not in accordance with the law.

## STATUTES AND REGULATIONS

### 49 C.F.R. § 175.10(a)(19)(iii)(B)

No more than two spare fuel cell cartridges may be carried by a passenger or crew member as follows:

. . .

(B) Division 2.1 liquefied flammable gas or hydrogen in a metal hydride and Division 4.3 water-reactive material in carry-on baggage only.

### 49 U.S.C. § 5120

(a) Participation in international forums. Subject to guidance and direction from the Secretary of State, the Secretary of Transportation shall participate in international forums that establish or recommend mandatory standards and requirements for transporting hazardous material in international commerce.

(b) Consultation. The Secretary may consult with interested authorities to ensure that, to the extent practicable, regulations the Secretary prescribes under sections 5103(b), 5104, 5110, and 5112 of this title [49 U.S.C.S. §§ 5103(b), 5104, 5110, and 5112] are consistent with standards and requirements related to transporting hazardous material that international authorities adopt.

(c) Differences with international standards and requirements. This section —

(1) does not require the Secretary to prescribe a standard or requirement identical to a standard or requirement adopted by an international authority if the Secretary decides the standard or requirement is unnecessary or unsafe; and

(2) does not prohibit the Secretary from prescribing a safety standard or requirement more stringent than a standard or requirement adopted by

an international authority if the Secretary decides the standard or requirement is necessary in the public interest.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Lilliputian has developed fuel cell technology to respond to the large and growing demand for longer-life portable electronic devices. Its unique approach to providing longer device life uses thin-film solid oxide fuel cell technology and micro electrical mechanical system-based fabrication methods, fueled by replaceable butane cartridges. J.A. at 54; *see also* J.A. at 26 (picture of Lilliputian's butane fuel cell cartridge). Fuel cell technology, such as that produced by Lilliputian, provides a much longer source of power than current battery technology and thus is attractive to electronics and computer manufacturers interested in extending the useable life of their products between chargings. For that reason, these manufacturers have taken a strong interest in Lilliputian's butane fuel cell technology. J.A. at 54. Intel, as noted in Lilliputian's corporate disclosure statement, has taken a greater than ten percent stake in Lilliputian because of its belief in the potential for such fuel cells. *See* Rule 26.1 Disclosure Statement, *supra*, at ii.

Butane is a liquefied flammable gas, classified by PHMSA as a Division 2.1 material. J.A. at 54. In addition to its use in Lilliputian's fuel cells, butane is used in many other consumer products such as disposable lighters and cordless curling irons. *Id.* Butane is also widely used as an environmentally safe alternative to

3

chlorofluorocarbon ("CFC") propellants found in aerosols such as deodorant and hairspray. *Id.* at 55. Each of these other items is currently allowed in airplane passengers' checked baggage. *See, e.g.*, 76 Fed. Reg. 3308, 3335 (Jan. 19, 2011) (acknowledging that passengers may bring "similar items," such as aerosols, containing butane in their checked baggage). Because the point of a portable power source is to be easily transportable, limitations on customers' ability to take butane fuel cells with them wherever they may go severely impact the viability of fuel cells as an alternative to battery power. J.A. at 54.

The International Electrotechnical Commission ("IEC") is a Geneva, Switzerland-based non-governmental organization founded in 1906 that publishes consensus-based international standards for electric and electronic products. More than eighty nations, including the United States, send delegations of experts to assist the IEC with its work. *See generally* http://www.iec.ch/about/profile/?ref=menu (last visited Aug. 29, 2013). As part of its work establishing international standards, the IEC adopted a series of tests designed to guarantee the safety of fuel cell cartridges such as Lilliputian's. The IEC requires such fuel cell cartridges to be able to survive without leakage: (1) a 1.2 meter drop test unpackaged onto an unyielding surface, (2) a 1.8 meter drop test unpackaged, (3) a 100 kilogram crush test, (4) a 95 kilopascal

differential pressure test, (5) vibration testing, and (6) temperature extremes from -40ºC to +70ºC.  J.A. at 127.

The International Civil Aviation Organization ("ICAO") is a specialized agency of the United Nations.  It establishes international aviation safety standards to be adopted by its 191 member states, including the United States.  *See generally* http://www.icao.int/about-icao/Pages/default.aspx (last visited Aug. 29, 2013).  The ICAO's Dangerous Goods Panel is the division of the ICAO responsible for recommending safety standards for the international transport of hazardous goods. *Id.*  In 2009, the Dangerous Goods Panel agreed to allow butane and other fuel cell cartridges containing liquefied flammable gas to be placed in passengers' checked baggage.  J.A. at 55-56; *see also* J.A. at 5 (DGP report).  The ICAO adopted this recommendation and agreed to allow passengers to carry up to two spare fuel cells of no more than 200 milliliters in volume in their checked baggage.  J.A. at 3, 55.

On October 21, 2009, PHMSA issued an Advance Notice of Proposed Rulemaking announcing its intention to consider amending its Hazardous Materials Regulations ("HMR") by incorporating the new international standards recommended by the ICAO.  74 Fed. Reg. 53982 (Oct. 21, 2009).  Slightly less than one year later, on August 24, 2010, PHMSA issued its Notice of Proposed Rulemaking.  75 Fed. Reg. 52070 (Aug. 24, 2010).  PHMSA revealed its intention to harmonize most of its HMR

with the new international standards; however, it gave notice that it intended to depart from the international standard and prohibit passengers from carrying spare butane and other Division 2.1 material fuel cells in checked baggage. *Id.* at 52089-90.

Lilliputian and nine other commenters submitted comments opposing PHMSA's stated intention to refuse to harmonize its HMR with the international standard. J.A. at 40-65, 68-86 (comment letters). Commenters, including Lilliputian, questioned the agency's lack of explanation for its decision and directed PHMSA's attention to a May 2010 study conducted by the Federal Aviation Administration ("FAA") that tested multiple types of fuel cells and found that any fire resulting from butane fuel cells could be extinguished by the existing fire suppression systems onboard aircraft. J.A. at 59; J.A. at 9 (FAA test summary).

Despite the extensive, in-depth comments submitted, PHMSA declined to modify its prohibition of butane and other Division 2.1 material fuel cells in its published final rule. 76 Fed. Reg. at 3337. The agency briefly acknowledged that the FAA's tests indicated that a fire could be "readily extinguished" by existing aircraft fire safety systems but declined without substantive explanation to alter its proposed rule. *Id.* PHMSA also declined to explain why it accepted the exact same international standards and tests it rejected with regard to checked baggage to *allow* butane fuel cells' transport as cargo via a different regulation governing so-called

"limited quantities." *See id.* at 3335 (explaining that the agency "agree[s]" that it "offers no safety rationale for this exclusion as the fuel cell cartridges themselves are subject to much more stringent construction, testing, and packaging requirements than for similar articles (*e.g.*, aerosols)").

Lilliputian filed an appeal with PHMSA on February 18, 2011, pointing out the agency's failure to provide a reasoned explanation, respond to the comments received, and explain the internal inconsistencies in its harmonization decisions.  J.A. at 90-100. PHMSA responded by reopening the comment period with regard to the issue of allowing passengers to place fuel cells in their checked baggage.  77 Fed. Reg. 31274, 31277 (May 25, 2012).  Lilliputian and seven other commenters filed additional letters supporting passengers' ability to carry fuel cells.  J.A. at 101-18, 120-32.  Those commenters included such divergent groups as retailers and foreign governments.  *See id.* at 124 (Brookstone comment letter); *id.* at 129-32 (People's Republic of China comment letter).  Nonetheless, on January 7, 2013, PHMSA summarily denied Lilliputian's appeal to modify the prohibition.  78 Fed. Reg. 1101, 1104 (Jan. 7, 2013). Its administrative options exhausted and its products still banned from passengers' checked baggage, Lilliputian filed its Petition for Review in this Court on March 8, 2013.  *See* Dkt. No. 1.

## SUMMARY OF ARGUMENT

The Court should vacate the challenged portion of the final rule as arbitrary and capricious under the Administrative Procedure Act ("APA").  Throughout the rulemaking proceeding, PHMSA failed to provide any explanation of its risk-assessment methodology, making it impossible for Lilliputian to counter the agency's unstated rationale.  PHMSA also failed to provide a reasoned explanation for its prohibition of butane fuel cell cartridges in checked baggage, including failing to explain (1) why it declined to follow the statutory presumption and harmonize American regulations with those approved by international bodies, (2) how and why it disagreed with the safety analyses undertaken and considered sufficient by other regulators, (3) why it disagreed with the FAA's own test results, and (4) why PHMSA prohibited butane fuel cell cartridges when it permits other, less stringently tested items containing butane in checked baggage.  PHMSA additionally failed to respond to multiple substantive comments highlighting the above and other errors, further requiring this Court to vacate the challenged portion of the rule.

## STANDING

Lilliputian has standing to pursue its challenge to the final rule promulgated by the Secretary under 49 U.S.C. § 5127 as an entity "adversely affected or aggrieved by an action of the Secretary."  PHMSA denied Lilliputian's administrative appeal of the

Secretary's final rule on January 7, 2013.  *See* 78 Fed. Reg. at 1104.  Lilliputian further

participated in the rulemaking proceedings by submitting multiple comment letters.

*See* J.A. at 54-61, 90-100, 110-18.   The Secretary's final decision prohibiting the

carrying of butane fuel cell cartridges in passengers' checked baggage adversely affects

Lilliputian's ability to market its butane fuel cells to American consumers.

## **ARGUMENT**

PHMSA's final rule is a textbook example of arbitrary and capricious agency

action.  Rather than examining the evidence independently and taking into account

the many thorough comments the agency received, PHMSA repeatedly ignored the

findings of the relevant international standard-setting bodies — findings it credited

elsewhere in the same rulemaking proceeding — and declined to respond to the

numerous comments submitted by Lilliputian and other stakeholders.   It instead

chose to issue brief, unsupported, and conclusory statements in a failed attempt to

justify its refusal to harmonize its hazardous material regulations ("HMR") with those

of international bodies.  Because PHMSA failed to give a reasoned explanation for its

failure to harmonize American regulations with their international counterparts and

because it failed to respond to multiple, substantive comments that cast substantial

doubt on its proposed rule, the agency acted arbitrarily and capriciously.  This Court

therefore should vacate the challenged portion of the rule.

9

# I. PHMSA FAILED TO PROVIDE A REASONED EXPLANATION FOR REFUSING TO FOLLOW THE PRESUMPTION THAT ITS REGULATIONS SHOULD BE HARMONIZED WITH INTERNATIONAL STANDARDS.

Federal law creates a presumption that, wherever possible, PHMSA will harmonize American HMR with their international counterparts. *See* 49 U.S.C. § 5120(b). The APA requires that, as a necessary component of any reasoned decision-making regime, an "agency must examine the relevant data and articulate a satisfactory explanation for its actions." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As part of that explanation, it is critical that the agency "identify and make available technical studies and data" employed in reaching its decisions. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007). PHMSA did neither here. Despite repeated references to a "risk-based regulatory amendment," PHMSA never revealed its risk assessment methodology. *See* 75 Fed. Reg. at 52090. To this day, Lilliputian has no idea what factors PHSMA considered, what method it used to weigh them, and how its analysis differed from that of the international bodies to consider the issue. Further, the explanations that PHSMA did provide were conclusory and contradictory. Instead of reasoned decision making, the agency produced *ipse dixit*. Such an opaque process does not comply with the APA. Consequently, this Court should vacate the challenged portion of the final rule.

10

## A. Standard of Review

Federal statute provides that this Court reviews any objections to the promulgated final rules under the well-known standards of the APA. *See* 49 U.S.C. § 5127(c); *see also id.* § 5103(b)(2) (requiring that all rules be promulgated by the Secretary through the procedures prescribed by the APA). This Court must reverse any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The APA standard requires the Court to act as much more than a "rubber stamp." *United States Lines, Inc. v. Fed. Maritime Comm'n*, 584 F.2d 519, 526 (D.C. Cir. 1978). Instead, its review must be "searching and careful" to ensure that PHMSA "adequately considered all relevant factors . . . and that it has demonstrated a rational connection between the facts found and the choices made." *Id.* (internal quotation marks omitted; omission in original) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)). This "thorough, probing, in-depth review" can only be based on the record in this case. *Id.* at 526, 532. "[U]nstated considerations" and arguments advanced for the first time on review by the agency are irrelevant and cannot save a rule from vacatur. *Id.* at 532.

## B. PHMSA Improperly Withheld Its Methodology for Assessing Risk, Necessitating the Vacatur of the Challenged Portion of the Rule.

Playing a game of regulatory hide-the-ball, PHMSA refused to reveal the risk assessment methodology that led it to disregard the recommendations of other

11

international regulatory bodies and prohibit the carrying of butane fuel cell cartridges in airline passengers' checked baggage. PHMSA repeatedly claimed to make its decision because of a "risk-based" process, 75 Fed. Reg. at 52090, that revealed "the questionable integrity of [butane fuel cell cartridges] when packed in a passenger's checked baggage." 76 Fed. Reg. at 3337. However, despite these claims, nowhere did the agency explain or reveal the methodology, testing, or data that supported its conclusion. Indeed, the only testing available demonstrated exactly the opposite: Butane fuel cell cartridges are safer than many other items currently allowed inside checked baggage. The APA prohibits agencies from basing their decisions on such secret (or non-existent) data, studies, or methodologies. To this day, Lilliputian has no clue on what data PHMSA based its decision. Because PHSMA refused to reveal "the most critical factual material . . . used to support its decision," its final rule prohibiting the transportation of butane fuel cell cartridges in checked baggage cannot stand; and this Court should vacate it as arbitrary and capricious.

The APA mandates that an agency publish notice of its proposed rulemaking and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). As this Court has repeatedly held, for the rulemaking process to function properly, an agency must "identify and make available technical studies and data that it has employed in

12

reaching the decisions to propose particular rules." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991); *see also Owner-Operator*, 494 F.3d at 199.  Failure to do so is "serious procedural error," as it prevents interested parties from providing the "meaningful commentary" vital to informed agency rulemaking. *Solite Corp.*, 952 F.2d at 484.  Only by exposing the "most critical factual material that is used to support the agency's position" to criticism and refutation from interested parties can an agency maintain the rational decision-making process mandated by the APA. *Owner-Operator*, 494 F.3d at 199.

In *Owner-Operator Independent Drivers Association*, this Court reversed a rule promulgated by the Federal Motor Carrier Safety Administration ("FMCSA") because the agency had engaged in a similar scheme to shield its supporting data and methodology from the crucible of public comment.  There, the FMCSA promulgated rules to regulate the length of time a commercial truck driver could remain on duty. The agency argued that it relied on previously published data to reach the conclusions that supported its expansion of the amount of time truck drivers could be on the road.  *Id.* at 201.  However, as this Court held, the agency did not just reuse prior data or even check the continued accuracy of prior data with newly available information. *Id.*  Instead, the agency changed its methodology entirely and did not reveal that it had done so until publication of the final rule.  *Id.*  (noting that the agency's calculation

13

method for the effect of fatigue on truck drivers was "entirely new"). Commenters

had "no way of knowing" in advance that the agency would employ the methodology

it did. *Id.* at 202. Thus, because the agency hid its calculation method until the final

rule's publication and that omission prejudiced commenters, this Court vacated the

FMCSA rule and required the agency to start the process again. *Id.* at 202-03.

The actions of PHMSA here make the FMCSA look like an exemplar of

transparency by comparison. During the notice-and-comment period, afterward, and

to the present, PHMSA has failed to reveal any methodology, data, and technical

studies on which it relied to depart from the international consensus and prohibit

butane fuel cells in checked baggage. *See* 78 Fed. Reg. at 1104 (rejecting Lilliputian's

administrative appeal but failing to cite to any data or studies on which the agency

may have relied); 76 Fed. Reg. at 3337 (same for publication of final rule); 75 Fed.

Reg. at 52090 (stating only that PHMSA is proposing a "risk-based regulatory

amendment" that diverges from the international standard). Indeed, PHMSA has

admitted this deficiency, acknowledging in its order promulgating the final rule that it

"did not provide data or analysis supporting the proposal. . . ." 76 Fed. Reg. at 3337.

PHMSA further admitted that, despite its failure to mention the study in any of its

rulemaking notices, the agency was aware of "tests performed at the FAA Technical

Center on fuel cell cartridges containing flammable liquid material," including butane.

*Id.*; *see also* J.A. at 26-27 (FAA Technical Center testing results of Lilliputian's fuel cell). These tests revealed that a "fire can be readily extinguished with current fire suppression systems onboard an aircraft." 76 Fed. Reg. at 3337. Despite this positive test result, PHMSA stood by its original decision to prohibit butane fuel cell cartridges in checked baggage without citation to any technical study or other data that would support its position. *Id.*; *see also* 78 Fed. Reg. at 1104.

The only justification PHMSA provided during the rule making process was an unspecified and unsupported concern about "the questionable integrity of [fuel cells] when packed in a passenger's checked baggage." 76 Fed. Reg. at 3337. Following Lilliputian's administrative appeal, the agency, for the first time, added concerns about passenger *naiveté* with hazardous materials, concerns about "the limitations of fire suppression and detection systems," unspecific speculation about additional testing "DOT may consider in the future," and a general statement that "We believe that when new passenger authorizations are granted, consideration must be given to the cumulative risk of the new authorization combined with existing authorizations." 78 Fed. Reg. at 1104. PHMSA cited no data, studies, or support in the record for these newly announced concerns. *See id.* Nor did the agency explain how its concerns could be squared with the only study of butane fuel cells in the record — a study that directly contradicted its stated rationale. *Compare id.* (failing to explain the

15

contradiction between the only study cited and the agency's conclusion), *with* 76 Fed. Reg. at 3337 (admitting that the FAA tests "indicated that . . . the fire can be readily extinguished with current fire suppression systems"), *and* J.A. at 9 (results of FAA study demonstrating same).     Further, PHMSA revealed this cursory list of unsupported concerns only after the final comment period had ended.     No commenter received an opportunity to challenge and refute PHMSA's heretofore unstated fears. *Cf. Owner-Operator*, 494 F.3d at 199 (explaining that the factual material supporting an agency's decision must be made public before the comment period closes).  One cannot refute an argument not previously made.

Reviewing this record, this Court is faced with two possibilities:  (1) uncited studies and data exist supporting PHSMA's position, or (2) PHMSA cites no data in support of its position because none exists.  This Court's duty is the same in either case.   Commenters cannot respond to data not disclosed.   Failure to disclose the critical data is a "serious procedural error" mandating vacatur of the rule, as Lilliputian has mounted "a credible challenge" to the agency's position. *Id.* at 199, 202.  Where no data exists to support the agency's decision, the rule similarly cannot stand.  *See Advocates for Hwy. & Auto Safety v. Fed. Hwy. Admin.*, 28 F.3d 1288, 1294 (D.C. Cir. 1994) (vacating rule where agency's conclusion was "devoid of empirical support in the record").  Because PHMSA has failed to disclose — or even hint at — the data

and studies on which its decision relied, its rule prohibiting certain fuel cells in checked baggage cannot stand.  This Court should vacate the rule and remand to the agency with instructions to either release for public comment the data on which it relied or promulgate a rule actually supported by the record evidence.

### C. PHMSA Failed to Provide a Reasoned Explanation for Its Actions, Necessitating the Rule's Vacatur.

PHMSA's failure to explain its methodology was not the only mystery left behind in the pages in the Federal Register.  Despite longstanding precedent requiring an agency to "provide an explanation that will enable the court to evaluate [its] rationale at the time of the decision," PHMSA has completely failed to elucidate how the facts found in the record led to its decision to prohibit the transport of butane fuel cells in checked baggage.  *United Mine Workers of Am. v. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (alteration in original).  The agency has refused to explain (1) why it failed to harmonize American HMR with international HMR, (2) why it declined to find sufficient the testing procedures for fuel cells deemed adequate by international bodies, (3) why it ignored the results of the FAA's safety study of fuel cells, and (4) why it ignored its own prior decisions to allow other butane-containing products with less stringent safety requirements to be carried in checked baggage. Any one of these omissions would be sufficient by itself to require vacatur of the rule. Together, they paint a picture of an agency determined to reach a result regardless of

17

its inability to justify it.  Because this is not the reasoned decision-making process required by the APA, PHMSA has acted arbitrarily and capriciously; and its rule prohibiting the transport of butane fuel cells in checked baggage should be vacated.

An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted).  This Court will find an agency has failed to meet this requirement:

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*  An agency may not ask this Court to do its job for it; therefore, this Court cannot make up for deficiencies in the agency's reasoning or accept *post hoc* rationalizations of the agency's actions by its attorneys.  *Id.* at 43, 50.  The agency's action will rise and fall based solely on the information and explanations in the administrative record.  *See id.* at 50 ("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").  By this standard, PHMSA's silence on the key points of decision before it is woefully inadequate.

*First*, PHMSA failed in its primary duty to explain why it declined to follow the lead of international bodies and harmonize American HMR regarding the transport of

18

butane fuel cells.  Federal law presumes that the Secretary will harmonize regulations regarding the transport of hazardous materials with the standards adopted by "international authorities" unless the Secretary finds that the international standard is unsafe.  49 U.S.C. § 5120(b).  In its Notice of Proposed Rule Making, PHMSA conceded that "Federal law and policy strongly favor the harmonization of domestic and international standards for hazardous materials transportation" and that the agency, absent a finding of "overriding public interest," is "require[d] . . . to align the HMR with international transport standards. . . ."  75 Fed. Reg. at 52070.  PHMSA further found that harmonization "promotes the safety of people, property, and the environment by reducing the potential for confusion" while also "serv[ing] to facilitate international commerce" by preventing American companies from being at a competitive disadvantage *vis-à-vis* the transportation of their goods.  *Id.* at 52092.

Based on the statutory and regulatory commitment to harmonization, one would expect to see detailed findings explaining why PHMSA chose to create a schism with its international counterparts and prohibit the transport of butane fuel cell cartridges in checked baggage.  One, however, will look in vain; the explanation is nowhere to be found.  *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90.  PHMSA does not reserve even one line of text to explain (1) how the creation of a breech between American and international shipping standards could

enhance safety, given the agency's position that harmonization *increases* safety, *cf.* 75 Fed. Reg. at 52092 (noting that harmonization "promotes the safety of people, property, and the environment"); (2) how failing to harmonize might affect American businesses by potentially placing them at a competitive disadvantage to their international peers whose customers may check butane and other fuel cells in their baggage, particularly in light of PHSMA's stated position that harmonization is good for American economic competitiveness, *cf. id.* (explaining the economic benefits of harmonization); and (3) what "overriding public interest" outweighed the benefits of harmonization and the judgment of PHMSA's international peers. *Cf.* 75 Fed. Reg. at 52070 (explaining that the agency will only depart from international standards in cases of a demonstrated "overriding public interest"). In short, reading the pages of the Federal Register only reveals the action PHMSA has taken, not the rationale it applied in its decision. Such decision making is not reasonable under the APA and cannot stand. *See Alltel Corp. v. FCC*, 838 F.2d 551, 556 (D.C. Cir. 1988) (holding that, where the "reasoned explanation is not articulated by the agency in the orders under review and cannot be reasonably discerned by this court," the agency action will be reversed).

*Second*, PHMSA fails to explain where it takes exception with the safety analyses conducted by international bodies and why the testing those bodies found adequate to

allay any safety concerns failed similarly to allay PHMSA's. *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90. The Dangerous Goods Panel of the ICAO, the international standard-setting body for hazardous materials transport contained within the United Nations, determined that the IEC's Micro Fuel Cell Safety Standard answered its safety concerns about the transportation of fuel cells containing butane and other liquefied flammable gasses. *See* J.A. at 3-5. The IEC standard requires all fuel cells in checked baggage to survive, with no leakage: (1) a 1.2 meter drop unpackaged against an unyielding surface; (2) a 1.8 meter drop test unpackaged; (3) a 100 kilogram crush test; (4) a 95 kilopascal differential pressure test or pressure testing at two times the internal pressure at 55ºC, whichever is greater; (5) vibration testing; and (6) exposure to temperature extremes ranging from -40ºC to +70ºC. *Id.* at 127. Airline baggage handlers may not always be kind to passengers' luggage; but the ICAO found that fuel cells that (1) could pass this test, (2) were less than 200 milliliters in capacity, and (3) were limited to two per passenger could be carried in checked baggage without concern. *Id.* at 3, 55, 127.

Given this extensive and rigorous testing, the confidence the United Nations expert body placed in it, and the presumption in favor of harmonization, one would be forgiven for searching for PHMSA's explanation of what concerns it had with the ICAO's findings or the IEC's testing regime. Once again, however, the Federal

Register is silent: PHMSA said nothing. *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90. Not only did PHMSA ignore the testing regime approved by the United Nations, it also declined to specify one of its own. Despite Lilliputian's numerous inquiries, both formal and informal, to PHMSA, the agency has steadfastly refused to identify any additional testing steps that would satisfy its unexplained concerns with the ICAO-approved IEC standard. *But cf.* 78 Fed. Reg. at 1104 (suggesting, with no mention of the ICAO/IEC approved testing, that perhaps fuel cell designs should "be tested and demonstrate a certain level of safety prior to being authorized onboard passenger-carrying aircraft").

PHMSA's refusal to explain its disagreement with the internationally approved standards is all-the-more perplexing given multiple commenters' citation of the standard to the agency and *the agency's acceptance of the same standard as sufficient* to reverse its decision to prohibit the transport of the same fuel cells as so called limited quantities. In its original Notice of Proposed Rulemaking, PHMSA also had declined to harmonize its limited quantity regulations with those approved by the ICAO. *See* 75 Fed. Reg. at 52089 (explaining that PHMSA would not allow fuel cells containing liquefied flammable gasses such as butane "to be transported as a limited quantity by aircraft"). However, following the receipt of comments from Lilliputian and others citing the rigorous international testing regime, PHMSA reversed course, admitted

22

that it had offered "no safety rationale for this exclusion as the fuel cell cartridges themselves are *subject to much more stringent construction, testing, and packaging requirements*," and modified the final rule to allow the fuel cells to be transported as limited quantities. 76 Fed. Reg. at 3335 (emphasis added). PHMSA has thus accepted the same international testing standard as sufficiently rigorous to allow for the transport of fuel cells as limited quantity cargo as it *sub silentio* rejected for carrying the same fuel cells in passengers' checked baggage. *Compare id.* (modifying rule to allow for carriage as limited quantities), *with id.* at 3337 (refusing to modify the prohibition on fuel cells in passenger baggage). This schizophrenic result demands an explanation. PHMSA provides none.

*Third*, PHMSA not only failed to explain its disagreement with international standard-setting bodies but also failed to explain its disagreement with the FAA's own test results. At PHMSA's request, the FAA's Technical Center tested several fuel cell cartridges. *See* J.A. at 7-39 (Preliminary Investigation of the Fire Hazard Inherent in Micro Fuel Cell Cartridges, May 2010) (hereinafter "FAA Report"). This FAA Report found that none of the tested fuel cell cartridges detonated or ejected flaming particles. *Id.* Thus, the fuel cells performed better than common batteries did in earlier tests. *See id.*; *see also id.* at 127. The tests also revealed that current aircraft fire suppression systems could extinguish any fire created by butane fuel cell cartridges

such as that produced by Lilliputian. *Id.* at 26-27. Although, PHMSA failed to mention the test results in its Notice of Proposed Rule Making, when cited by multiple commenters, PHMSA admitted the cited test results were accurate. *Compare* 75 Fed. Reg. at 52089-90 (making no mention of the May 2010 test results), *with* 76 Fed. Reg. at 3337 (conceding that the tests showed that "in the case of a fire involving these materials, the fire can be readily extinguished with current fire suppression systems onboard an aircraft").

That sentence is PHMSA's only statement in the record regarding the FAA's tests. *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90. PHMSA has not explained why it remains concerned, despite the test results, that a fire involving a fuel cell cartridge might burn out of control. It has not identified any flaws in the FAA's testing regime, nor has it identified any alternative testing regime it would prefer the FAA to employ in an attempt to allay its unspoken fears. *Id.* Silence is not an explanation. Neither is reasserting an unsupported statement that fuel cells are of "questionable integrity . . . when packaged in a passenger's checked baggage." 76 Fed. Reg. at 3337. The lack of an explanation from PHMSA and the lack of support in the record for its prohibition on carrying butane fuel cell cartridges in checked baggage require this Court to vacate the rule. *See, e.g., Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48 (reversing rule where no cogent explanation of why agency "has

exercised its discretion in a given manner"); *Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586, 588 (D.C. Cir. 2010) (vacating FCC ruling because "[t]he agency's explanation cannot run[] counter to the evidence") (internal quotation marks omitted; alteration in original).

*Fourth*, PHMSA completely failed to explain why it decided to prohibit passengers from placing butane and other fuel cell cartridges in their checked bags when PHMSA *will* allow passengers to put other products containing liquefied flammable gasses in their checked baggage even though those other products are not subject to safety testing as stringent as what fuel cells must undergo. For example, current regulations allow passengers to carry in their checked baggage aerosols containing liquefied flammable gasses that serve as propellant for hairspray and deodorant. *See* 49 C.F.R. § 175.10(a)(1)(i) (stating that "toilet articles for personal use (including aerosols)" may be "carried in carry-on and checked baggage"). Aerosol spray cans, of necessity, have external actuators that, when triggered, release the flammable propellant into the air — a feature prohibited on fuel cell cartridges subject to the ICAO-approved standard. J.A. at 5 (noting that fuel cell cartridges do "not have the ability to be actuated or to short-circuit or to charge batteries on their own"); *see also* J.A. at 115-16 (Lilliputian second comment letter).

PHMSA admitted that aerosols are subject to less stringent testing requirements than the prohibited fuel cell cartridges are. *See* 76 Fed. Reg. at 3335 ("[T]he fuel cell cartridges themselves are *subject to much more stringent* construction, testing, and packaging requirements than for similar articles (*e.g.*, aerosols).") (emphasis added). PHMSA has provided no explanation for its contradictory treatment of "similar articles." *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90.

This Court recently faced a similar agency decision full of categorical declarations and assumptions with no supporting evidence or explanations. In *Delta Air Lines, Inc. v. Export-Import Bank of the United States*, this Court refused to "prolong the matter" and issued a short opinion reversing the agency. 718 F.3d 974, 978 (D.C. Cir. 2013). PHMSA's stark failure here to provide any explanation for its actions combined with its failure to expose the "most critical factual material that is used to support the agency's position" to public notice and comment, requires a similarly efficient treatment. *Owner-Operator*, 494 F.3d at 199. PHMSA's "complete lack of explanation for . . . the agency's analysis [is] arbitrary and capricious" and requires this court to vacate the challenged portion of the rule. *Id.* at 204 (vacating the rule for lack of an explanation); *see also Kristin Brooks Hope Ctr.*, 626 F.3d at 591 (vacating rule where agency failed to connect the "facts found" to the "choice made"); *United Mine Workers*

26

*of Am.*, 358 F.3d at 44 (refusing to allow agency to withdraw a proposed rule because stating a reason "without explanation[] is not informative in the least; it is merely a reiteration of the decision"); *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 42 (D.C. Cir. 1977) (per curiam) (vacating rule, in part, because agency relied on "unverified assumption[s]" that were "basically speculative" because they were not supported by any data).

## II. IN ADDITION TO FAILING TO PROVIDE AN EXPLANATION, PHMSA REFUSED TO RESPOND TO NUMEROUS SUBSTANTIVE COMMENTS, REQUIRING VACATUR OF THE RULE.

Failing to provide an explanation on its own accord was not PHMSA's only grievous mistake.  The agency also failed to respond to numerous in-depth, substantive comments that challenged the very foundation of the promulgated final rule.  These commenters repeatedly alerted PHMSA to the deficiencies noted above as well as additional concerns regarding the feasibility of enforcing a prohibition on certain fuel cells in checked baggage and the effect of such a prohibition on the American fuel cell industry.  Despite a process comprising three separate rulemaking notices over four years, PHMSA never addressed the serious concerns the commenters brought to its attention.  Consequently, PHMSA's failure to respond meaningfully to the comments it received provides this Court with one more reason

to vacate the agency's prohibition of butane and other selected fuel cell cartridges from passengers' checked baggage.

The notice and comment process was designed to provide "an exchange of views, information, and criticism between interested persons and the agency." *Home Box Office*, 567 F.2d at 35. Allowing an agency to ignore substantive comments would frustrate the "exchange of views" the APA envisions. Thus, it is a longstanding rule that an agency "must respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule." *Action on Smoking Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983) (internal quotation marks omitted). This requirement mandates that an agency "do more than simply ignore comments that challenge its assumptions" and instead "come forward with some explanation" of its views in light of the submitted comments. *Alltel Corp.*, 838 F.2d at 558.

Throughout the rulemaking proceedings, numerous commenters submitted letters challenging PHMSA's failure to explain its rationale for prohibiting butane and other fuel cells in checked baggage. These commenters brought to PHMSA's attention the rigorous testing regime approved by the ICAO, the FAA Report's conclusion that current aircraft fire suppression systems could quickly extinguish any

28

fire that did ignite, and the contradictory nature of PHMSA's treatment of butane fuel cells compared with other items containing butane. *See* J.A. at 40-65, 68-86, 101-18, 120-32. As noted above in Section I.C., PHMSA failed to provide any explanation of how it resolved the "significant problems" the comments raised. Its refusal to respond renders the resulting final rule arbitrary and capricious. *See, e.g.*, *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1081 (D.C. Cir. 2003) (remanding agency action because "their comment deserves an answer"); *Action on Smoking Health*, 699 F.2d at 1216-17 (explaining the standard and finding that a one paragraph response containing no reasoning or data to support its conclusions was "palpably inadequate").

The significant problems raised by the comment letters did not end there. The Dangerous Goods Advisory Council ("DGAC") and the International Air Transport Association ("IATA") both raised serious concerns about the feasibility of PHMSA's prohibition on butane and other fuel cells in passengers' checked baggage. As the DGAC noted, the distinction between checked baggage and carry-on baggage is often illusory for today's traveler. Airlines frequently gate check baggage originally meant as carry-on when planes' overhead bins become full. How are airlines to alert passengers of the distinction and enforce the prohibition? J.A. at 76 (DGAC Oct. 25, 2010

comment letter).  PHMSA does not say.  *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90.

The IATA raised a second feasibility concern.  Passengers traveling by air in the United States often originate from overseas.  Those overseas jurisdictions follow the ICAO standards, which allow for passengers to place butane fuel cells in their checked baggage.  How are air carriers to monitor these international-origin passengers' bags, or is this the responsibility of the Transportation Security Administration or Immigration and Customs Enforcement?  *See* J.A. at 105 (IATA July 3, 2012 comment letter).  PHMSA would not respond.  *See* 78 Fed. Reg. at 1104; 76 Fed. Reg. at 3337; 75 Fed. Reg. at 52089-90.

In its own comment letters and administrative appeal, Lilliputian attempted to do the work of PHMSA for it.  Lilliputian suggested a five-factor risk analysis for fuel cell cartridges and explained how evidence in the record answered each concern.  J.A. at 59-60, 115-16.  The first risk to consider is that of ignition or sparking; however, the IEC Safety Standard, accepted by the ICAO, requires fuel cell cartridges to survive drops, crush tests, pressure changes, and extreme temperature variations without releasing their contents, preventing ignition.  *Id.* at 59.  The risk of catching fire from an external fire and the ability to extinguish any fuel cell fire should also be considered.  As Lilliputian explained, the FAA's own tests demonstrated that present

fire suppression systems could extinguish an onboard fuel cell fire. *Id.* at 60; *see also* 76 Fed. Reg. at 3337 (confirming these test results). That the cartridges would be inside passengers' luggage would further minimize the risk a fire could ignite the cartridges before the automatic fire suppression system could extinguish an external fire. J.A. at 60. A fourth factor in the risk analysis would be any experience involving similar materials. Butane and other Division 2.1 materials are allowed in passenger luggage through aerosol cans and cordless hair curlers. *See* 49 C.F.R. § 175.10(a)(1)(i). Despite many years of experience with these items, there is no history of accidents or other incidents resulting from such items. J.A. at 115-16. Fuel cell cartridges would be even safer, as under the approved international safety standards, the cartridges cannot have an accessible release mechanism — unlike an aerosol can. *Id.* at 116. The fifth and final risk factor Lilliputian suggested PHMSA consider was whether the volume of material was relevant in terms of managing any risk. The ICAO standard limited passengers to no more than two fuel cells per person, with each fuel cell to be no more than 200 milliliters in volume. *Id.*; *see also id.* at 3 (DGP standard). PHMSA has itself recognized the difference in risk between bulk shipments and the limited quantities carried by passengers. 75 Fed. Reg. at 52073 ("PHMSA has long recognized the need to authorize limited exceptions for the transportation of certain hazardous materials described as limited quantities or consumer commodities."); J.A.

at 116.   The small volume limitations imposed by the internationally approved

standard therefore further reduce any risk from allowing butane fuel cell cartridges in

passengers' checked baggage.

PHMSA allowed these lengthy and thoughtful comments to go in one ear and

out the other.  The agency's entire response to every comment received, in full, is the

following:

> In the January 19, 2011 final rule, we revised the 49 CFR 175.10
> passenger exceptions to allow passengers and crew members to place
> certain spare fuel cell cartridges containing a flammable liquid (Class 3)
> or corrosive material (Class 8) in checked baggage. We limited the fuel
> cell cartridge chemistries allowed in checked baggage by excluding fuel
> cell cartridges containing Divisions 2.1 (flammable gas) and 4.3
> (dangerous when wet) material. Although this is inconsistent with the
> ICAO Technical Instructions, we believed that the prohibition should
> include spare fuel cell cartridges containing Division 2.1 materials.
> Flammable gases are generally prohibited from transportation on
> passenger-carrying aircraft as cargo. When combined with the
> uncertainty of the effect of baggage handling on the durability of these
> products when stowed in a passenger's checked baggage, the safety risks
> posed are of concern. In their administrative appeals, FCHEA and LSI
> requested that PHMSA revise § 175.10 to align with the ICAO Technical
> Instructions and allow spare fuel cell cartridges containing Division 2.1
> flammable gas to be carried in checked baggage.
>
> PHMSA response.
>
> In the May 25, 2012 NPRM, we granted the appeal for reconsideration
> by providing additional opportunity for public comment on the issue. In
> response, one commenter (ALPA) opposed lifting the prohibition on
> spare fuel cell cartridges containing Division 2.1 flammable gas for
> carriage in checked baggage. The remaining commenters (IATA, P.R.
> China, Intel, DGAC, FCHEA, LSI, and Brookstone) all support lifting

the U.S. prohibition and recommend alignment with the ICAO Technical Instructions. Points leading to the Department's decision are:

. Passenger authorizations for hazardous materials are outside the scope of the traditional hazardous materials transportation regulatory system. Many of the critical safety requirements of the HMR that would apply to these items when in transportation as cargo do not apply to passengers, for example, hazard communication, pilot notifications and cargo stowage requirements for hazardous materials.

. Passengers are not trained to recognize potential hazards. Although passengers pack, handle, and (in many cases) should communicate the hazardous materials carried onboard to an air carrier, the HMR does not require training for passengers. In most instances, passengers are unlikely to be aware of the safety implications if certain commodities are subject to improper packaging or handling.

. Recognition of the limitations of fire suppression and detection systems. We recognize that aircraft fire detection and suppression systems do not prevent fires nor are they designed to completely extinguish fires.

. Article Design Management. One example DOT may consider in the future could be similar to is its approach in regulating portable oxygen concentrators (POCs). That is, before any POC design is allowed onboard aircraft, the design must be tested and demonstrate a certain level [of] safety prior to being authorized onboard passenger-carrying aircraft.

. Cumulative risk of additional passenger authorizations. We believe that when new passenger authorizations are granted consideration must be given to the cumulative risk of the new authorization combined with existing authorizations.

78 Fed. Reg. at 1104.

PHMSA's response fails to address in any way the comments questioning the feasibility of prohibiting fuel cells in checked baggage given the realities of modern air travel. *Compare id.* (in no way acknowledging commenters' feasibility concerns), *with* J.A. at 76 (DGAC letter), *and* J.A. at 105 (IATA letter). It continues to ignore the testing regime endorsed by the ICAO and the FAA's own tests. Like an ostrich, the agency stuck its head in the sand and pretended that no testing had occurred. *Compare* 78 Fed. Reg. at 1104 (stating that, before any cartridge is allowed on an aircraft, "the design must be tested and demonstrate a certain level [of] safety"), *with* J.A. at 14 (FAA Report stating that the tests conducted indicated current fire suppression systems are adequate to handle a fire), *and* J.A. at 127 (reciting the IEC-required/ICAO-approved testing regime). PHMSA similarly expresses concern with passenger *naïveté*; but it failed to respond to comments noting that (1) there is no history of incidents with other items also containing butane that are allowed in checked baggage; (2) there are no reported incidents since PHMSA allowed butane fuel cell cartridges in passengers' carry-on baggage and since the ICAO allowed them in international travelers' checked baggage; and (3) aerosol cans containing a greater volume of liquefied flammable gas and with an accessible and relatively fragile release mechanism are considered safe for travel in passengers' checked baggage. *Compare* 78 Fed. Reg. at 1104 (claiming that passenger authorization to transport hazardous

materials are "outside the scope of the traditional hazardous materials transportation regulatory system"), *with* J.A. at 2 (DGP report stating that analysis demonstrates that carrying fuel cell cartridges in "checked baggage is *actually safer than carry-on*") (emphasis added), *and* J.A. at 115-16 (noting there is no evidence in the record of a history of accidents from aerosol cans, curling irons, and butane fuel cells carried on or checked by passengers). These are not the actions of an agency responding to substantive comments by coming "forward with some explanation that its view is based on some reasonable analysis." *Cf. Alltel Corp.*, 838 F.2d at 558. These are the actions of an agency determined to keep its true rationale a secret.

Rather than an exchange of ideas, PHMSA has engaged in a soliloquy designed to reach the result it wanted regardless of the comments submitted and the evidence in the administrative record. Because "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public," PHMSA's refusal to acknowledge the serious concerns raised by commenters about its decision to prohibit butane and other Division 2.1 fuel cells in passengers' checked baggage renders the challenged portion of the rule arbitrary and capricious. This Court should therefore vacate it and remand it to the agency. *See Home Box Office*, 567 F.2d at 35-36.

## CONCLUSION

Under the safety standards adopted by the ICAO, international airline passengers can place up to two butane fuel cells in their checked baggage. PHMSA declined to harmonize its regulations with the international standard despite a statutory presumption favoring harmonization. It has also failed to provide an explanation for its decision or to respond to the stack of comments it received supporting harmonization. If PHMSA wishes to stand alone in the face of international consensus, the least it must do is provide a cogent explanation for its decision to do so, linking the facts in the record to the decision it has made. Because PHMSA has thoroughly failed to do that here, its current rule cannot stand; and this Court should vacate it as a textbook example of arbitrary and capricious agency action.

Dated:  August 29, 2013

Respectfully submitted,

Gregory S. Walden
Stephen A. Vaden
Patton Boggs LLP
2550 M Street, N.W.
Washington, D.C.  20037
(202) 457-6000 – Telephone
(202) 457-6315 – Facsimile

*Counsel for Petitioner Lilliputian Systems, Inc.*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Civil Procedure, Lillputian certifies that the Opening Brief of Petitioner is in compliant with the type volume limitations of 14,000 words for principal briefs. The brief was typed in Garamond size 14 font. The Opening Brief of Petitioner contains 8, 441 words.

| Dated: August 29, 2013 | *Stephen Alexander Vaden*<br>Greg S. Walden<br>Stephen A. Vaden |
|---|---|

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2013, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.  I also sent to counsel at the addresses listed below two copies each of this brief via overnight mail.

Dana L. Kaersvang, Attorney
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
Phone: (202) 307-1294
Fax: (202) 514-9405
Email: Dana.L.Kaersvang@usdoj.gov

Michael J. Singer, Attorney
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
Phone: (202) 514-5432
Fax: (202) 514-8151
Email: Michael.Singer@usdoj.gov


/s/ Stephen A. Vaden
Gregory S. Walden
Stephen A. Vaden

39